IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JULIE GOBLE,                                    )
                                                )
        Plaintiff,                              )
                                                )
v.                                              )        Civil Action No. 1:23-cv-1774 (RDA/LRV)
                                                )
LEXISNEXIS SPECIAL SERVICES, INC., )
                                                )
        Defendant.                              )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant LexisNexis Special Services, Inc.'s ("LNSSI") Motion for Summary Judgment (Dkt. 15). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum of Support (Dkt. 16); Plaintiff Julie Goble's Response in Opposition (Dkt. 20), and Defendant's Reply (Dkt. 21), this Court GRANTS the Motion for Summary Judgment (Dkt. 15) for the reasons that follow.

## I. PROCEDURAL BACKGROUND

Plaintiff filed her Complaint in the Circuit Court for Fairfax County, Virginia on November 1, 2023, asserting claims of sex discrimination in violation of the Virginia Human Rights Act ("VHRA") and retaliation in violation of the VHRA. Dkt. 1-1 at 9-10. On December 26, 2023, LNSSI filed a Notice of Removal, removing the case to this Court pursuant to diversity jurisdiction under 28 U.S.C. § 1332. Dkt. 1. On January 16, 2024, LSSNI filed its Answer to Plaintiff's Complaint. Dkt. 9. The Court subsequently issued a Scheduling Order, and the parties proceeded to discovery. Dkt. 13.

On September 6, 2024, LSSNI filed the instant Motion for Summary Judgment.  Dkt. 15.
On September 20, 2024, Plaintiff filed her Opposition.  Dkt. 20.  On September 27, 2024, LSSNI
filed its Reply.  Dkt. 21.

## II.  UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motion at issue here, the Court must first determine the undisputed
summary judgment record, as summary judgment is only appropriate where there are no genuine
disputes of material fact.  Defendant appropriately set forth its Statement of Undisputed Facts with
citations to the record as required by the Local Rules and the Rule 16(b) Scheduling Order.  *See*
Dkt. 16 at ¶¶ 1-109; Dkt. 14 ¶ 10(f); E.D. Va. L.R. 56(B) (requiring the moving party to list all
material facts as to which there is no genuine issue and to cite to portions of the record).  Plaintiff,
similarly, complied with the Local Rules by properly setting forth her limited disputes with some
of the asserted undisputed facts.  Dkt. 20 at 3-17.  Some of the material facts that Plaintiff attempts
to dispute are not actually disputed, however, because Plaintiff merely seeks to provide additional
information to supplement or qualify those facts.  This is not a viable method of disputing a
material fact on summary judgment.  *See Emmons v. City of Chesapeake*, 2019 WL 8062700, at
*2 (E.D. Va. Oct. 15, 2019) ("While the parties appear to disagree about the characterization of
some facts put forth by the opposing party or feel the need to supplement or qualify the opposing
party's stated facts, Plaintiffs and Defendant do not have any genuine disputes regarding facts
necessary and material to resolution of the . . . case."), *aff'd* 982 F.3d 245 (4th Cir. 2020).
Therefore, the Court treats those facts as undisputed.  *See* Fed. R. Civ. P. 56(e)(2) (permitting the
court to consider improperly supported or inadequately addressed facts as undisputed for the
purpose of summary judgment).  Further, the Court treats any facts that are listed in Defendant's

statement of undisputed material facts and not specifically controverted by Plaintiff as admitted.

*Hayes v. Sotera Def. Sol's, Inc.*, 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016).

The Court has reviewed all of the parties' submissions and determined that the following facts are undisputed:[1]

1. LNSSI is a defense contractor that supports U.S. military and intelligence agencies. It creates actionable intelligence in support of national security and global missions in countering proliferation, counterterrorism, counterintelligence, and countering weapons of mass destruction, transnational organized crime, and trafficking.

2. LNSSI's analyses enable its customers to deploy appropriate countermeasures, increase force protection, and dismantle criminal and terrorist networks worldwide. LNSSI's customers are various U.S. military and intelligence agencies.

3. LNSSI Pattern Analysts locate relevant data sets, conduct analyses, identify patterns, and produce and present intelligence for its customers.

4. Pattern Analysts are required to: learn and apply highly technical data processing skills and analytic methodologies; utilize analytical software tools at an expert level; capture key aspects of analytic findings and generate actionable leads and insights; explain or translate highly technical findings for customers; and operate without direct supervision.

5. Pattern Analysts must have a high-level government security clearance and be able to work with classified information in a secure facility. They are required to report any potential security leak or spillage.

6. Due to the classified and compartmented nature of the work, project details are only shared with Pattern Analysts on a need-to-know basis. Pattern Analysts are privy only to details regarding their own projects, and they do not know about the work of others unless there is a need to know.

7. The secure workspace where Pattern Analysts operate is a very small, grey rectangular room, with cubicles in rows, and windowless, closed-door offices and desktops linings the sides. Once cleared to work, Pattern Analysts are supplied accounts and access to intelligence sources, akin to a top-secret internet.

8. Plaintiff learned about the LNSSI Pattern Analyst position through a technology expo, where she met Tim Kearny ("Kearny"), an LNSSI Program Manager.[2]

---

[1] The Court also resolves any actual disputes with respect to a specific asserted undisputed fact in the footnotes.

[2] At times, the parties refer to "Kearney" instead of "Kearny." This appears to be a typographical error, and the Court will use "Kearny."

9.  Kearny and another Program Manager, Scott McKissick ("McKissick"), interviewed Plaintiff and were impressed with her background in law enforcement.

10. Kearny decided to hire Plaintiff as a Pattern Analyst.

11. Kearny became Plaintiff's direct supervisor during her employment with LNSSI.  Kearny had worked as a Pattern Analyst for many years at LNSSI.

12. McKissick supervised Plaintiff and others when Kearny was not available.  McKissick had been a Pattern Analyst with LNSSI for nine years.

13. Plaintiff admits that both Kearny and McKissick knew her gender when they interviewed her.  Plaintiff also admits that neither Kearny nor McKissick had any problem with her gender when she was hired.[3]

14. On April 11, 2022, Plaintiff began as a Pattern Analyst.

15. Three other male Pattern Analysts were hired within approximately a month of Plaintiff: Anthony "Nick" Major, Weston Phillips, and Douglas Scott.  All four of the Pattern Analysts, including Plaintiff, had different backgrounds, experience, and abilities.

16. When Plaintiff was employed, LNSSI did not provide much training in a classroom format, and there was no set curriculum or course that everyone was required to complete.  When formal classes were provided, Plaintiff was invited.

17. Training was fluid and customized to each person's needs.  LNSSI expected Pattern Analysts to primarily learn by doing on the job.[4]

---

[3] Plaintiff attempts to dispute this fact by arguing that LNSSI's Human Resources Advisor believed that LNSSI was required to provide affirmative action plans on all of its contracts, including data on the sex of its employees.  Dkt. 20-4 at 14 ¶¶ 9-20.  But in asserting that affirmative action plans were required, Plaintiff does not dispute that Kearny and McKissick knew her gender when they interviewed her and that they had no problem with her gender when she was hired.  Accordingly, there is no genuine dispute of fact.  *See Emmons*, 2019 WL 8062700, at *2 (stating that disagreeing about the characterization of some facts and supplementing or qualifying those facts does not create a genuine dispute of material fact).

[4] Plaintiff attempts to dispute the asserted fact by arguing that the training she received was not customized to her and that she received less training than her male counterparts.  In support of her assertion, however, Plaintiff cites to the deposition of Dan Helms, a senior Pattern Analyst at LNSSI, where Helms states that Plaintiff was struggling because "[Plaintiff] did not have the background in using [the relevant] tools that most of the people on the team had, and that [Plaintiff] didn't have the years of experience that many of the newer members of the team already brought to bear."  Dkt. 20-3 at 6 ¶¶ 14-22.  This fails to dispute Defendant's asserted fact regarding how training was customized to each person's needs and that Pattern Analysts were expected to learn by doing the job.  Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no dispute of asserted fact.

18. Kearny was responsible for ensuring that Plaintiff was trained. He assigned several different people to train Plaintiff, including Dan Helms and Dr. Lauren Mondshein.[5]

19. Helms gave Plaintiff specialized attention and training.[6]

20. Helms has 30 years of experience working as a Pattern Analyst; he is employed by LNSSI as a Senior Pattern Analyst and is the main subject matter expert for pattern analysis.

21. Plaintiff believes that the lack of formal training classes causes failure and prevents people like her from progressing. Plaintiff further contends that LNSSI should have had a formal training program, like every other job she has had.

22. Plaintiff admits her views on training are an opinion.

23. Plaintiff admits that Nick Major, another Pattern Analyst hired a month after Plaintiff, also did not receive formal training.

24. Plaintiff admits that Weston Phillips, another Pattern Analyst hired one month after Plaintiff, also did not receive formal training.

25. Plaintiff has no reason to believe other successful Pattern Analysts, including other women, received any formal training.

26. The work, assignments, and projects of LNSSI Pattern Analysts are driven by the customer's interests. The customer's assignments and projects do not necessarily come with a specific question to be answered.

27. The intelligence LNSSI process is often the product of discovery analysis. The customer identifies an area of interest and furnishes some initial data. The Pattern Analyst then finds and identifies additional data, enriches the data using software tools and other available

---

[5] Plaintiff again attempts to dispute this asserted fact but fails to product any contrary evidence that demonstrates that Kearny was not responsible for ensuring Plaintiff was trained or that he did not assign different people to train Plaintiff. Plaintiff cites to her own declaration where she asserts that "[t]here was no formalized training provided" and Kearny "provided [her] no direction or advice" nor did Kearny at any point "work directing with [Plaintiff] on the data. Dkt. 20-8 ¶¶ 3, 6. This does not dispute that Kearny was responsible for Plaintiff's training or that he assigned several people to train Plaintiff. Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no dispute of asserted fact.

[6] Plaintiff disputes Defendant's original asserted fact that Helms provided Plaintiff more attention and training than others. Dkt. 20-8 ¶ 15. Though not material, the Court has modified Defendant's asserted fact to omit this assertion. Plaintiff further attempts to dispute that Helms did not work with Plaintiff intensely until just before she was put on a Corrective Action Plan ("CAP"). Plaintiff does not dispute, however, that Helms did work with Plaintiff intensely at that time. Accordingly, there is no dispute as to the modified asserted fact.

resources, and applies analytic methodologies to identify predictable behavior, patterns, and other actionable intelligence.

28. The intelligence that LNSSI produces and provides often answers questions the customer did not know to ask.

29. Dr. Lauren Mondshein is a veteran analyst with a high level of ability and years of experience at LNSSI. Plaintiff and Dr. Mondshein are friends.

30. As part of Plaintiff's training, Kearny assigned Plaintiff to work with Dr. Mondshein.

31. Kearny asked Dr. Mondshein to provide Plaintiff with data to work on, which Dr. Mondshein did. Dr. Mondshein asked Plaintiff to manipulate the data, make observations, and report back. Plaintiff says she did this for months before receiving a new project.

32. Plaintiff admits Dr. Mondshein gave her tips and pointers, taught her things, and assisted her when she asked for help.

33. Plaintiff says the data Dr. Mondshein gave her was left over from another project. Plaintiff further states that the work was not a real project because it was assigned by LNSSI and not a customer.[7]

34. Dr. Mondshein shared her feedback regarding Plaintiff's training performance with Kearny.

35. In August 2022, Kearny asked Helms to work with Plaintiff and to provide oversight.[8]

---

[7] Plaintiff attempts to dispute this fact by arguing that she was told to play with this single set of data while other employees received new data once a week from customers on projects that customers had an interest in. This however fails to dispute the asserted fact, because this is simply Plaintiff disagreeing "about the characterization" and "supplement[ing] the opposing party's stated fact[]," which does not create a genuine dispute of material fact here. *See Emmons*, 2019 WL 8062700, at *2. Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no genuine dispute of asserted fact.

[8] In the Defendant's statement of undisputed fact, Defendant contends that in August 2022, Kearny began working directly with Plaintiff himself. *See* Dkt. 16-7 at 20 ¶¶ 13-20; *id.* at 21 ¶¶ 1-8; *id.* at 31 ¶¶ 5-12. Plaintiff disputes that Kearny ever worked directly with her. *See* Dkt. 20-8 ¶ 6 ("At no point did Kearny work directly with [Plaintiff] . . . ."). This fact is not material, and the Court will omit this assertion from the statement of undisputed facts. Plaintiff, however, does not dispute that Kearny asked Helms to work with Plaintiff and provide oversight. Accordingly, there is no dispute as to the Court's modified undisputed fact.

36. In the view of her employer, Plaintiff's work on discovery analysis from Dr. Mondshein did not produce a finding after five months.[9]

37. Per Kearny, the work would have progressed more quickly if Plaintiff's skills were where they needed to be.[10]

38. On September 22, 2022, McKissick was supervising the team and observed Plaintiff's work on the data provided to her by Dr. Mondshein.

39. While McKissick and Plaintiff discussed her observations, McKissick was loud and at one point said, "you don't know what this means." Other personnel in the workspace could hear McKissick.

40. A new Pattern Analyst typically starts being productive after a month and is able to work independently after six months.[11]

41. Five months into her employment, Plaintiff needed remedial training on rudimentary skills, so Kearny decided to place Plaintiff on a Corrective Action Plan ("CAP").[12]

---

[9] Plaintiff attempts to dispute this by again providing context to Defendant's asserted fact. Plaintiff contends that discovery analysis does not necessarily lead to a published product or finding. This context however does not dispute that Plaintiff's work on the discovery analysis from Dr. Mondshein did not produce a finding after five months. Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no genuine dispute as to the asserted fact.

[10] Plaintiff once again attempts to dispute the asserted fact by providing an alternative view – Helms' opinion on Plaintiff's progress as a Pattern Analyst. Dkt. 16-8 at 14 (Helms suggesting that Plaintiff could possibly have made more progress with a different teacher). Not only does Plaintiff's cited evidence fail to dispute Defendant's asserted fact, Defendant's asserted fact clearly states that this was *Kearny's* opinion of Plaintiff's progress, not Helms' opinion. Accordingly, Plaintiff has not properly disputed the asserted fact, there is no genuine dispute as to the asserted fact.

[11] Plaintiff attempts to dispute this fact by presenting one example of Nick Major who did not produce a product for ten months. *See* Dkt. 20-5 at 12-13 (noting that Nick Major produced a product jointly with Weston earlier, but did not produce an independent product for approximately ten months). This does not change the generalization that Pattern Analysts *typically* start being productive after a month and independent after six months, and Plaintiff does not produce any evidence to the contrary. Accordingly, there is no genuine dispute as to the asserted fact.

[12] Plaintiff attempts to dispute this asserted fact by providing context as to *why* she still needed remedial training. Dkt. 20 at 8 (disputing Defendant's asserted fact by arguing that "[Plaintiff] continued to need training *because* she had not been given an assignment with a veteran analyst during her first five months of employment" (emphasis added)). Plaintiff does not dispute that she needed the training, nor does she dispute that Kearny placed Plaintiff on the CAP. Accordingly, there is no genuine dispute as to the asserted fact.

42. Kearny has placed a male Pattern Analyst on a CAP before.

43. On September 30, 2022, Kearny met with Plaintiff privately to implement the CAP. The CAP reflects that Plaintiff had been unable to incorporate the guidance provided to her into her work and could not operate independently. The CAP also identified other deficiencies, including Plaintiff's inability to demonstrate data processing skills and methodologies, or utilize software tools at the level required by the customer.[13]

44. LNSSI specified that to successfully complete the CAP, Plaintiff had to demonstrate proficiency on a discovery project, explain the analysis she performed, attend regular meetings, and provide reports detailing her engagement with her team members.

45. The same day that Kearny placed Plaintiff on the CAP, he assigned her a project from the customer (hereinafter the "September Project").

46. The CAP was scheduled to operate from September 30 to October 31, 2022.

47. Because Plaintiff was sick for nearly a full week during the CAP, and Kearny himself was out of office for a week, Kearny extended the CAP for another month, giving Plaintiff additional time to show the progress required.

48. Plaintiff signed and acknowledged receipt of the CAP but disagreed with most of what it said.

49. Plaintiff worked on the September Project for two months.

50. Plaintiff collaborated with Dan Helms on the September Project.

51. Plaintiff thinks highly of Dan Helms, who has 30 plus years of Pattern Analysis experience. Plaintiff respects Helms' knowledge and describes him as an absolute expert.

52. Plaintiff has noted that collaborating with a veteran analyst like Helms is how "you learn."

53. Plaintiff has stated that "Dan Helms is the expert and [Plaintiff] spent all these hours working with him." And that "Helms was giving [Plaintiff] expert advice."

---

[13] Plaintiff again attempts to dispute the asserted fact by providing reasoning as to why she suffered the challenges that resulted in the CAP – specifically, that Defendant failed to train her, assign her substantive work, or allow her to collaborate with others. Dkt. 20 at 8. Again, providing this context does not dispute the asserted fact, and Plaintiff does not dispute that Kearny met with her to implement the CAP, nor does she dispute the challenges she faced that are reflected in the CAP. Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no dispute as to the asserted fact.

54. Helms, a subject matter expert with years of expertise and personal experience with Plaintiff, describes her work as unprofessional and unreliable.[14]

55. In Helms' opinion, Plaintiff would seek his advice but then apply it incorrectly. Helms further believed that Plaintiff was unable to develop insights or work independently.[15]

56. Plaintiff admits that Helms' assessment of her performance is relevant to her allegations.

57. Kearny met with Plaintiff for check-in meetings throughout the CAP but repeatedly noted she was unable to explain her analysis.[16]

58. On October 11, 2022, after being placed on the CAP, Plaintiff emailed Jackie Reynolds ("Reynolds"), the LNSSI Director of Human Resources ("HR") and requested a meeting. Plaintiff did not say why she wanted a meeting.

59. On October 13, 2022, Reynolds invited Plaintiff to a meeting scheduled for that afternoon.

60. Though Reynolds set a meeting with Plaintiff on October 13, 2022, as Plaintiff had requested on October 11, 2022, Plaintiff claims Reynolds did not respond and ignored her.

61. On October 13, 2022, Plaintiff emailed Kearny, blind-copied Reynolds, and disagreed with the CAP. In her email, Plaintiff acknowledged she had struggled and needed to improve her skills but blamed this on her project and the fact that two other Pattern Analysts were collaborating on their projects and she had no one to collaborate with.[17]

62. On October 13, 2022, Reynolds met with Plaintiff and, upon learning Plaintiff had filed a complaint, interviewed her about her concerns. During the interview, Plaintiff reported that: (1) she felt her training was inadequate; and (2) she believed certain male analysts

---

[14] Plaintiff attempts to dispute this fact by asserting that Plaintiff's performance was a direct result of Defendant's failure to train her, assign her substantive work, or allow her to collaborate with others. Dkt. 20 at 8. This does not create a dispute with Defendant's asserted fact but rather provides her opinion as to *why* her performance was lacking. Accordingly, Plaintiff does not properly dispute the asserted fact, and there is no dispute as to the asserted fact.

[15] Here again, Plaintiff attempts to dispute the asserted fact by explaining why her performance was lacking. As discussed *supra*, this is not sufficient to create a genuine dispute of the asserted fact.

[16] Here again, Plaintiff attempts to dispute the asserted fact by explaining why her performance was lacking. As discussed *supra*, this is not sufficient to create a genuine dispute of the asserted fact.

[17] Here again, Plaintiff attempts to dispute the asserted fact by explaining why her performance was lacking. As discussed *supra*, this is not sufficient to create a dispute of asserted fact.

(specifically, Weston Phillips, Nick Major, and Doug Smith) had received better assignments than her.

63. Plaintiff confirmed to Reynolds that she was alleging sex discrimination.

64. Reynolds told Plaintiff she would investigate promptly.

65. As Reynolds indicated she would, Reynolds investigated Plaintiff's concerns.

66. The day after Reynolds interviewed Plaintiff, Reynolds interviewed Kearny, McKissick, and Eric Nelson.

67. Through those interviews, Reynolds determined that Program Managers assigned projects to Pattern Analysts based on the analyst's skillset, capabilities, availability, and the customer's requirements. Reynolds confirmed that female and male Pattern Analysts were assigned projects using the same criteria.[18]

68. Reynolds also learned that assigned work is based on the customer's changing needs, and no two assignments are the same.

69. Plaintiff did not know how Kearny assigned work.

70. Reynolds then evaluated the skillsets and capabilities of the other analysts Plaintiff mentioned – males who progressed faster, ostensibly because they received better training – by reviewing their resumes. Among other things, Reynolds found that Nick Major had four years of military intelligence experience with the Marines and that Doug Smith was a rehire with LNSSI who previously worked for the customer and had nineteen years of experience.

71. Plaintiff admits she did not know how much experience the other analysts had before joining or rejoining LNSSI.

72. Reynolds found that LNSSI had hired one female Pattern Analysts two months before Plaintiff, and it also employed two veteran female Pattern Analysts, including Dr.

---

[18] Plaintiff attempts to dispute the asserted fact by stating that "Reynolds did not draw this conclusion" and that Reynolds' conclusion was based on lies told to her by LNSSI employees such as Kearny and McKissick. Dkt. 20 at 10. But Plaintiff fails to cite to any evidence supporting these allegations. Accordingly, there is no genuine dispute as to the asserted fact. *See Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756 (D. Md. 2020) ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion."); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."); *Bruder v. Moniz*, 51 F. Supp. 3d 177, 191 (D.D.C. 2014) ("[Plaintiff's] mere speculation that [a witness] must be lying because her statement is not as specific as he would like it to be is not sufficient to show a genuine dispute of material fact.").

Mondshein.  Reynolds found that these other female Pattern Analysts were successful at LNSSI.

73. When investigating Plaintiff's complaints about her training, Reynolds learned that Plaintiff had received extra, individualized training from Kearny, McKissick, and Helms.[19]

74. Reynolds also learned that the four Pattern Analysts who were hired around the same time (including Plaintiff) had gone through the same or similar training but had ramped up at different paces and received different projects.[20]

75. At the conclusion of the investigation, Renolds found no indication of gender discrimination.[21]

76. Individuals holding a security clearance are required to report potential leaks to protect national security.

77. In Plaintiff's email to Kearny and HR about her CAP, Plaintiff referenced a particular data project by name.

78. Kearny was concerned about the specifics of this reference in the email, since the email was sent through an unsecure system.[22]

---

[19] Here again, Plaintiff attempts to dispute the asserted fact by arguing that she did not receive extra or individualized training from Kearny, McKissick, or Helms, but Plaintiff does not, dispute that this is what Reynolds learned through the course of her investigation, nor does Plaintiff provide any evidentiary support for her allegations.  Moreover, Plaintiff does not dispute that she worked with each of these veteran Senior Pattern Analysts.  Accordingly, there is no genuine dispute as to the asserted fact.

[20] Plaintiff disputes the asserted fact by stating that Kearny lied to Reynolds regarding whether Plaintiff received the same training as the other new pattern analysts.  Plaintiff cites no evidence for this allegation.  Further, Plaintiff does not dispute that this is an accurate representation of what Reynolds learned in her investigation.  Accordingly, there is no genuine dispute as to the asserted fact.

[21] Here again, Plaintiff attempts to dispute the asserted fact by alleging that Reynolds was lied to during her investigation.  Plaintiff produces no evidence to support this allegation.  Again, Plaintiff does not dispute that this was Reynolds' conclusion from the investigation.  Accordingly, there is no genuine dispute as to the asserted fact.

[22] Plaintiff attempts to dispute this fact by alleging that Kearny's concern about Plaintiff's potential security violation was insincere because "Kearny has provided abundant false testimony in this case." Dkt. 20 at 12.  Plaintiff, however, fails to cite any specific evidence to support this allegation.  Plaintiff instead cites other instances where she disagrees with Kearny's deposition testimony as support that Kearny lied about many things in this case.  This is insufficient to establish a dispute of the asserted fact. *McCree v. City of Chester*, 2022 WL 18958708 (D.S.C.

79. Kearny did not think the reference in the email was a policy violation, but he was not certain, and he "didn't want to risk promulgating in the case it [wa]s."[23]

80. Kearny takes security issues very seriously and has reported potential security violations in the past. Kearny has even reported a potential security concern on himself. None of those reports resulted in Kearny being notified of a security violation.

81. Kearny reported Plaintiff's email to the resident Facility Security Office ("FSO") per policy and left it in the FSO's hands.

82. Kearny also called Plaintiff to let her know what he was doing and why.

83. Plaintiff admits that individuals should report possible security violations and that, when in doubt, reporting is the correct action.

84. Plaintiff claims it was retaliatory when Kearny reported her possible security violation.

85. Plaintiff acknowledges that maybe Kearny was simply being upfront and telling Plaintiff what he was going to do.

86. The FSO ultimately purged the original email from LNSSI's systems.

87. As detailed in the CAP Conclusion document, Plaintiff failed to demonstrate proficiency because she could only complete tasks when guided step-by-step. Plaintiff's ability to utilize the required analytical software was also inadequate for the customer.[24]

88. As also detailed in the CAP Conclusion document, Plaintiff could not explain the discovery analysis she performed. The CAP contained the following statements regarding Plaintiff's skills and analysis:

(1) Plaintiff "[i]s unable to explain processes or the significance of the results."

(2) "[W]hen questioned on any findings of analytical methods[, Plaintiff] had difficulty explaining the steps she took and was unable to articulate them in any

_____

Aug. 22, 2022) ("Plaintiff cannot create a genuine issue of fact by merely questioning the truthfulness of a witness's uncontradicted statements."), *report and recommendation adopted*, 2023 WL 1814175 (D.S.C. Feb. 8, 2023). Accordingly, there is no genuine dispute as to the asserted fact.

[23] Here again, as discussed *supra*, Plaintiff attempts to dispute this fact by alleging that Kearny's beliefs were insincere and that Kearny was lying but does not provide any specific evidence to support her allegation. Accordingly, there is no dispute as to the asserted fact.

[24] Here again, Plaintiff attempts to dispute the asserted fact by explaining why her performance was lacking. As discussed *supra*, this is not sufficient to create a genuine dispute of asserted fact.

meaningful way that would allow someone else the ability to follow and recreate the analysis."

(3) "On many occasions, [LNSSI supervisors] would discuss ways forward to try, and when [supervisors] would check back [in with Plaintiff], . . . she would not be able to show [supervisors] what she did."

(4) "On multiple occasions, when questioned about the analysis [Plaintiff] would be unable to provide answers as to what she did or would say someone told [her] to do that, without being able to explain why [they] would do that."

89. Plaintiff also did not demonstrate her ability to operate independently.

90. After eight months of employment, at the end of her extended CAP, LNSSI terminated Plaintiff's employment, effective December 1, 2022.

91. Kearny, who hired Plaintiff, made the decision to fire her. Reynolds, the HR Director, concurred with the decision.

92. Kearny and Reynolds together notified Plaintiff of her termination.

93. Kearny told Plaintiff the reason for her separation would be reported as a skills mismatch. This is a term of art within the applicable severance plan which would allow Plaintiff to receive severance benefits despite her performance issues.

94. After Plaintiff's separation, LNSSI, through Kearny and McKissick, hired at least four additional female Pattern Analysts to work on the same customers' contracts.

95. The three other analysts hired around the same time as Plaintiff (Nick Major, Weston Phillips, and Doug Smith) learned quickly from their on-the-job training and progressed to more complex, difficult, and independent tasks. They had no performance issues and received positive performance ratings.

96. Even after working with Dan Helms during her CAP, Plaintiff remained unproductive.[25]

97. Plaintiff admits the reason for her different employment outcome could be skill-based and not discrimination.

---

[25] Plaintiff objects to that Defendant's asserted undisputed fact that Helms provided Plaintiff *individualized* training. Plaintiff, however, does not dispute that Helms worked with Plaintiff upon Plaintiff being placed on the CAP, nor does Plaintiff dispute that Plaintiff remained unproductive. *See* Dkt. 16-2 at 60 ¶¶ 3-4 (Plaintiff's Deposition) ("Dan Helms is the expert and I [Plaintiff] spent all these hours working with him."). Having so modified the asserted fact, there is no genuine dispute as to the asserted fact.

98. There are no gender diversity requirements for the contract on which Plaintiff worked.[26]

99. Applicable law prohibits any gender diversity requirement in federal contracting work.

100.        Plaintiff made the following admissions in her deposition:

> (1) There were no statements made by anyone at LNSSI to indicate that male and female Pattern Analysts were treated differently.

> (2) LNSSI is not required to have any formal training program, it is just Plaintiff's opinion that things should have been done differently.

> (3) Veteran analysts, like Helms and Dr. Mondshein, could help Plaintiff at any time and often did so.  Neither Kearny nor McKissick obstructed their training of Plaintiff.

> (4) Plaintiff has no basis on which to form an opinion about the skills of other Pattern Analysts.

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact."  *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).  The party seeking summary judgment bears the "initial burden to show the absence of a material fact."  *Sutherland v. SOS Intern., Ltd.*,

---

[26] Here again, Plaintiff attempts dispute this fact by arguing that LNSSI's Human Resources Advisor believed that LNSSI was required to provide affirmative action plans on all of its contracts, including data on the sex of its employees. Dkt. 20-4 at 14 ¶¶ 9-20.  This, however, does not create a dispute with the asserted fact that there were no gender diversity requirements on Plaintiff's contract.  Accordingly, Plaintiff has not properly disputed the asserted fact, and there is no genuine dispute as to the asserted fact.

541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

## IV. ANALYSIS

Plaintiff brings sex discrimination and retaliation claims against LNSSI under the VHRA, Va. Code §§ 2.2-3900 *et seq.* and Va. Code. §§ 2.2-520 *et seq.* The parties both analyze the VHRA claims under the same framework as Title VII claims. *See* Dkt. 16 at 22 (utilizing the *McDonnell-Douglas* framework to analyze Plaintiff's claim); Dkt. 20 at 17 (citing *U.S. Postal Serv. Bd. Of*

*Governors v. Aikens*, 460 U.S. 711 (1983), a Title VII case, as the standard under which to analyze Plaintiff's claims). Accordingly, as this Court has frequently recognized "because Title VII and the VHRA use substantially identical language," the Court will apply a Title VII framework when analyzing Plaintiff's claims. *McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024).

A Title VII claim is generally analyzed within the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[27] Under *McDonnell-Douglas*, (1) the plaintiff must establish a *prima facie* case; (2) the defendant must offer a legitimate, nondiscriminatory reason for the action taken, and then (3) the plaintiff must show that the offered explanation is pretextual. An employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and is a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). A plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147

---

[27] Plaintiff asserts that the *McDonnell-Douglas* framework should not apply here because Defendant has alleged a nondiscriminatory reason for the adverse employment action here. Dkt. 20 at 17-18. This argument is incorrect. In order to avoid the *McDonnell-Douglas* framework, Plaintiff would have to produce direct evidence of retaliation. Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x 675, 681 (4th Cir. 2009). Here, Plaintiff has not produced any direct evidence of discrimination or retaliation, nor does she claim that she has any such evidence. Rather, Plaintiff appears to seek to prove her discrimination and retaliation claims by way of circumstantial evidence. Thus, the *McDonnell-Douglas* framework applies here. Moreover, the cases upon which Plaintiff relies specifically refer to the *McDonnell-Douglas* framework, as Plaintiff cites *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000), for the proposition that "a plaintiff's prima face case, combined with sufficient evidence to find the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Dkt. 20 at 18. That citation describes the *McDonnell-Douglas* test. Accordingly, the Court appropriately relies on the *McDonnell-Douglas* framework here.

(2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted).

Ultimately, Plaintiff fails at every step of the analysis here. Plaintiff is unable to establish a *prima facie* case on both her sex discrimination and retaliation claims, and further Plaintiff is unable to establish that LNSSI's offered explanations for the actions taken were pretextual. Accordingly, the Motion will be granted.

### A. Plaintiff's Sex Discrimination Claim

Plaintiff alleges that LNSSI intentionally discriminated against Plaintiff on the basis of her sex when "it set her up of failure, assigned her . . . no actual projects while giving her male colleagues better opportunities and assignments, . . . [and] subjected her to a frivolous CAP." Dkt. 1-1 at 9.

### 1. *Prima Facie* Case

In order to establish a *prima facie* case of sex discrimination, Plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment.[28] *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Here,

---

[28] The fourth element of the *prima facie* case can also be characterized as whether Plaintiff suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Weatherford v. Salvation Army*, 2023 WL 141421, at *2 (W.D. Va. Jan. 10, 2023). Here, the parties' focus on using similarly situated employees as comparators to Plaintiff to establish discrimination, which courts frequently use as a barometer for determining whether there is an inference of unlawful discrimination, accordingly. Thus, because the parties rely on similarly situated comparators, the Court will follow in suit. *See* Dkt. 16 at 24-25 (Defendant arguing that "Plaintiff cannot Show that She Was Similarly Situated" to non-female comparators); Dkt. 20 at 20 (Plaintiff arguing that "[Plaintiff] was held to a higher standard than a male employee with the same position").

LNSSI concedes that Plaintiff is a female, and thus a member of a protected class, and that Plaintiff was discharged from employment. Therefore, only whether Plaintiff had a satisfactory job performance and whether similarly-situated employees outside her protected class received more favorable treatment are at issue.

a.  Plaintiff's Unsatisfactory Job Performance

To withstand LNSSI's summary judgment motion, Plaintiff must show that she was meeting LNSSI's legitimate job expectations before she was discharged. In assessing Plaintiff's job performance, "[i]t is the perception of the decision maker which is relevant." *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). Here, the undisputed record evidence indicates that Plaintiff was not meeting her employer's expectations at the time of her termination.

As listed in the job description when Plaintiff was hired, Pattern Analysts are required to, among other responsibilities: "[l]earn and apply highly technical data processing skills and analytical methodologies," "[p]rocess, integrate, sync, and analyze geospatial data from multiple data sources," "[o]perate professionally and effectively, often without direct supervision, while conducting high-quality analysis," and explain or "[t]ranslate highly technical findings for . . . customers into concise, actionable products." Dkt. 16-4 at 3. Plaintiff does not dispute that she was not fulfilling those job requirements. Dkt. 20 at 9 ¶¶ 59-60 (failing to dispute that Plaintiff was not performing well).

The undisputed summary judgment record clearly establishes that, after five months of working and an additional two months on the CAP, Plaintiff was unable to demonstrate the "processing skills and analytical methodologies," Dkt. 16-6 at 2, required for a Pattern Analyst. Plaintiff was only able to "execute processes when guided step by step" and was "unable to explain the processes or the significance of the results." *Id.* And Plaintiff's "skill levels [we]re

inadequate." *Id.*  Further, the undisputed summary judgment record clearly establishes that Helms – one of the senior Pattern Analysts who worked with Plaintiff on her CAP – believed that Plaintiff was a "net negative" and "was taking away productivity from other productive members of the team." Dkt. 16-8 at 11-12.  Plaintiff's direct supervisor, Kearny, himself met with Plaintiff for check-in meetings throughout the CAP but repeatedly noted that she was unable to explain her analysis.  Dkt. 16-6 at 4-5.  Kearny, then, made the decision to fire Plaintiff, Dkt. 16-7 at 29, on the grounds that Plaintiff had a "skills mismatch" – or in other words - that Plaintiff's "skills didn't match the job."  Dkt. 16-2 at 64.  Plaintiff has not produced credible evidence of her satisfactory job performance; to the contrary, the undisputed material facts show that her job performance was not satisfactory.  Indeed, Plaintiff concedes that she "did not 'make the leap.'"  Dkt. 20 at 15 ¶ 104.  In sum, the summary judgment record makes unmistakably clear that Plaintiff was not satisfying LNSSI's legitimate expectations for the Pattern Analyst position.

Seeking to avoid this conclusion, Plaintiff argues that she had improved on the CAP to a satisfactory level of performance.  Dkt. 20 at 18.  With respect to performance issues, there will always be a dispute between an employee and the decisionmaker who terminated that employee.  As the Fourth Circuit has made clear, a plaintiff's own belief regarding her performance does not create a genuine issue of material fact.  *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (stating that a plaintiff's "own claim of satisfactory job performance . . . cannot establish a genuine issue as to whether [plaintiff] was meeting [the employer's] expectations").  Importantly, when evaluating job performance, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).  Here, the undisputed summary judgment record clearly establishes that Kearny, as the decisionmaker, had sufficient basis to terminate Plaintiff based on her job performance.  Thus,

Plaintiff has failed to establish a *prima facie* case of discrimination because she was not meeting the legitimate expectations of her employer, and LNSSI is therefore entitled to summary judgment on this claim.[29]

### b. No Similarly Situated Comparators

Further, Plaintiff cannot establish a *prima facie* case of discrimination because she has produced no evidence that comparable Pattern Analysts were treated more favorably than she was. In other words, Plaintiff's claim fails because she has not identified that any comparators were similarly situated to her. In order for other Pattern Analysts "to serve as appropriate comparators, [P]laintiff must show that they were similarly situated to [her] in all 'relevant respects.'" *Haines v. Donahoe*, 2012 WL 3595965 (D. Md. Aug. 20, 2012), *aff'd*, 538 F. App'x 329 (4th Cir. 2013) (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)). Specifically, "[s]imilarly

---

[29] To the extent that Plaintiff attempts to blame her poor performance on the lack of available job training and argues that this, in itself, was discriminatory, Plaintiff's claim also fails. Plaintiff has conceded that her alleged comparators (Nick Major and Weston Phillips) also received no formal training. Dkt. 16 at 6 ¶¶ 23-24 (Nick Major and Weston Phillips received no formal training); Dkt. 20 at 6 (failing to address these statements of undisputed fact). Moreover, Plaintiff has conceded that LNSSI is not required to have any formal training program. Dkt. 16-2, Goble Dep. Tr. at 110:16-112:18. Additionally, Plaintiff may have her own particular view on what constitutes training, but it is clear from the summary judgment record that LNSSI went to great lengths to ensure that Plaintiff received training from different veteran analysts. *See* Dkt. 16 at 6-7 ¶¶ 29-32 (discussing training that Plaintiff received from Dr. Mondshein); Dkt. 20 at 7 (not disputing the asserted facts); Dkt. 16 at 7-8 ¶ 38 (asserting that Helms was assigned to work with Plaintiff and provide oversight); Dkt. 20 at 7 (failing to dispute this portion of the asserted fact). Additionally, at times, Kearny also began to supervise Plaintiff directly during the CAP. Dkt. 16 at 10 ¶ 62; Dkt. 20 at 10 (failing to dispute the asserted fact). This Court does not sit as a "super-personnel department" to weigh whether employers should or should not provide so-called "formal" training. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citations omitted). In any event, it is clear from the summary judgment record that Plaintiff received training and, regardless, the "denial of training" is not an "actionable adverse employment action." *Johnson v. Danzig*, 213 F.3d 631, 2000 WL 458887, at *2 (4th Cir. 2000) (unpublished); *Cohens v. Md. Dep't of Human Res.*, 2013 WL 394451, at *6 n.41 (D. Md. July 30, 2013) (denial of statement training opportunities do not constitute an adverse employment action). Accordingly, to the extent Plaintiff's arguments are premised on a lack of formal training, her arguments fail and are insufficient to create a genuine issue of fact sufficient to survive summary judgment.

situated employees are alike with respect to performance, *qualifications*, and conduct." *Palmisano v. Baltimore Gas & Elec. Co.*, 2010 WL 4117026, at *4 (D. Md. Oct. 18, 2010) (emphasis added).

Here, Plaintiff points to three Pattern Analysts hired around the same time as Plaintiff: Nick Major, Weston Phillips, and Douglas Scott. Plaintiff seems to assert that specifically Nick Major and Weston Phillips received better training and better projects than Plaintiff. LNSSI has produced evidence to establish that Nick Major and Weston Phillips were not similarly situated to Plaintiff, namely they had stronger qualifications than Plaintiff and a different background from Plaintiff, and thus were able to learn and progress more quickly as Pattern Analysts than Plaintiff. Plaintiff has adduced no evidence regarding the qualifications or skills of Nick Major or Weston Phillips. Moreover, it is not clear from the record that Major or Phillips had the same supervisor. All Plaintiff notes is her own observations that they were hired around the same time as her as Pattern Analysts but received better training and better projects. But Plaintiff fails to dispute that they "had different backgrounds, experience, and abilities." Dkt. 16 at 5 ¶ 15; Dkt. 20 at 3-4 (failing to dispute the asserted fact). Moreover, Plaintiff does not dispute that Major had four years of military intelligence experience and that Smith had previously worked for LNSSI. Dkt. 16 at 12 ¶ 75; Dkt. 20 at 10-11 (not disputing the asserted fact). Indeed, Plaintiff does not even allege in what way the training or assignments that Major and Phillips received were better or would have been applicable to her or that she would have had the skills necessary to complete them. Accordingly, Plaintiff has failed to establish based on the record that these comparators were similarly situated to her and summary judgment for LNSSI is appropriate on this claim.

### 2.  Pretext

Even assuming, *arguendo*, that Plaintiff had established a *prima facie* case of discrimination, Plaintiff has failed to show that LNSSI's legitimate, non-discriminatory reason for

her termination, namely her unsatisfactory job performance, was mere pretext. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (job performance is "widely recognized as [a] valid, non-discriminatory bas[i]s for any adverse employment decision"). Accordingly, Plaintiff has failed to create a genuine issue of fact as to her ultimate burden of establishing pretext.

To establish pretext in the context of a Title VII case, Plaintiff must present evidence sufficient for a fact finder to conclude that LNSSI's explanation is not the real reason for Plaintiff's termination as a Pattern Analyst, but rather was a pretext for discrimination against Plaintiff. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Plaintiff "can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of" LNSSI's given justification. *Moore v. Mukasey*, 305 Fed. App'x 111, 116 (4th Cir. 2008) (quoting *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006)). But Plaintiff may not "seek to expose [defendant's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News, Va*., 451 F.3d 311, 315 (4th Cir. 2006). Importantly, in the employment discrimination context, it is well-settled that federal courts should not sit as "a super-personnel department weighing the prudence of employment decisions." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (quoting *DeJarnette*, 133 F.3d at 299).

Here, Plaintiff argues that her termination was pretextual because she was improving at her job and that she was able to complete her job responsibilities to an acceptable level of performance. As stated *supra*, the summary judgment record, however, establishes that Plaintiff had unsatisfactory job performance according to her supervisor and numerous other senior analysts.

Plaintiff attempts to assert that "Defendant's witnesses" are lying about her job performance at LNSSI without citing to the evidentiary record. Plaintiff has produced no evidence to support her assertion that Kearny and others lied about her job performance, and in fact Defendant has produced ample evidence to support that Kearny and others believed Plaintiff had poor job performance. *See, e.g.*, Dkt. 16-8 at 11 ¶ 5-22 (Helms' Deposition) (noting that Plaintiff was a "net negative" and supporting Plaintiff became "burdensome"); *id.* at 12 ¶ 10 (noting that Plaintiff "was unproductive"; *id.* at 13 ¶¶ 13-16 (noting that "it was clear that [Plaintiff] was not producing at the level [LNSSI] had hoped and not participating at the level [LNSSI] had hoped"); Dkt. 16-6 at 2-5 (the CAP Conclusion document) (noting that Plaintiff "has failed to demonstrate highly technical data processing skills and analytical methodologies," Plaintiff's "skill levels are still inadequate," and Plaintiff "struggled to be able to explain the data and methodologies used for her project"). Indeed, in asserting that Defendant is "lying" about her job capabilities, Plaintiff does not allege that she could perform the job as instructed, but that she came up with a "brand-new [sic] way" to perform the task. Dkt. 20 at 18. Thus, this implicitly concedes that Plaintiff was not performing the job as expected and not following instructions. And, again, as the Fourth Circuit has recognized an employee's "subjective view of her job performance is no sufficient to survive summary judgment." *Mercer v. Arc of Prince George's Cnty., Inc.*, 532 F. App'x 392, 397 (4th Cir. 2013). Beyond this, Plaintiff puts forth no other evidence or argument of why Defendant's termination of her was pretextual.

In sum, Plaintiff has failed to show that LNSSI's legitimate, non-discriminatory reason for her termination, namely her unsatisfactory job performance, was mere pretext. *See also Collier v. Charlottesville Sch. Bd.*, 218 F. App'x 244, 245 (4th Cir. 2007) ("[U]nsubstantiated assertions as to pretext . . . [cannot] stave off summary judgment."); *Newby v. Whitman*, 340 F. Supp. 2d 637,

662 (M.D.N.C. 2004) ("Plaintiff cannot create a genuine issue of material fact by simply contending that Defendant must be lying as to the reason for [the adverse action], without presenting any evidence or basis for that claim."). Accordingly, summary judgment must be entered in favor of LNSSI on Plaintiff's discrimination claim.

### B. Plaintiff's Retaliation Claim

Defendant has also moved for summary judgment on Plaintiff's retaliation claim. As with Plaintiff's discrimination claim, the Court also analyzes Plaintiff's claim under the *McDonnell-Douglas* burden-shifting framework. Again, Plaintiff has failed to establish a genuine issue of material fact in this regard and summary judgment in favor of Defendant is appropriate.

To establish a *prima facie* case of retaliation, Plaintiff must prove three elements: that (1) she engaged in a protected activity; (2) her employer took adverse action against her; and (3) the adverse action was causally connected to her protected activity. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)). Under this burden-shifting framework, if a plaintiff establishes a *prima facie* case of retaliation, the burden of production then shifts to the defendant to articulate a legitimate, non-retaliatory justification for taking the employment action at issue. *Navy Fed. Credit Union*, 424 F.3d at 405. If the defendant meets this burden, the burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reason is pretextual. *Id.*

Plaintiff alleges three potential adverse actions here: the CAP, the potential security violation report, and her termination. The Court will take each of these in turn.

### 1. The CAP

Plaintiff alleges that "Defendant intentionally retaliated against Plaintiff for complaining of sex discrimination when it . . . subjected her to a CAP." Dkt. 1-1 at 10. Plaintiff, however, cannot make out a *prima facie* case that being subjected to the CAP was retaliation because Plaintiff does not provide any evidence to show that Plaintiff engaged in a protected activity before being placed on the CAP. In fact, Plaintiff argues that the only protected activity she engaged in was "when she emailed Reynolds and Kearny on October 13, 2022." Dkt. 20 at 20. Plaintiff was placed on the CAP on September 30, 2022. Plaintiff has not alleged, nor produced any evidence to suggest, that she engaged in a protected activity before being placed on the CAP. Accordingly, summary judgment in favor of Defendant is appropriate in this regard. *See Byers v. HSBC Fin. Corp.*, 416 F. Supp. 2d 424, 438 (E.D. Va. 2006) (holding that a plaintiff "must show that the adverse employment action took place after the protected activity and because of the protected activity") (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002); *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998)).

### 2. Potential Security Violation Report

Next, Plaintiff alleges that Defendant retaliated against her by "falsely accusing her of committing a security violation." Dkt. 1-1 at 10. The undisputed summary judgment record shows that Plaintiff engaged in a protected activity when she emailed Reynolds and Kearny on October 13, 2022, complaining of sex discrimination. In Plaintiff's email to Kearny and Reynolds, sent through an unsecure system, Plaintiff referenced a particular data project by name. That same day, Kearny reported the email to the FSO as a potential security violation. The FSO ultimately purged the email from the company systems.

Assuming *arguendo* that Plaintiff is able to make out a *prima facie* case of retaliation with respect to the potential security violation report, LNSSI has provided a legitimate, non-retaliatory reason for reporting Plaintiff's email to the FSO, and Plaintiff has provided no evidence that LNSSI's articulated reason is pretextual. In this respect, it is undisputed that individuals with a security clearance, including Kearny, are required to report any potential security leaks. Dkt. 16 at 13 ¶ 82; Dkt. 20 at 11-12 (undisputed). Reporting potential security violations is consistent with Kearny's ordinary course of conduct, and, indeed, he has previously reported himself. Dkt. 16 at 13 ¶ 85; Dkt. 20 at 12 (undisputed). Kearny was doing as he was required when he reported Plaintiff's email to the FSO. Although Plaintiff generally focusses her attention on Kearny, Plaintiff does not offer anything specific to undermine the sincerity of his belief that this potential security violation needed to be reported. Dkt. 20 at 12. Nor does Plaintiff dispute that this was a reportable event. Indeed, Plaintiff testified that Kearny followed the proper course of conduct for a potential violation. Dkt. 16-2, Goble Dep. Tr. at 150:1-13 (when asked whether someone should report an event even if they have doubts regarding whether it constitutes a security violation, Plaintiff responded "I believe they should"). Indeed, in her deposition, Plaintiff attributes the retaliation as not the security report itself, but "the very fact that he felt the need to call me and tell me all of this." *Id.* Thus, Plaintiff concedes that Kearny's report was appropriate. Moreover, in response to the report, the email was scrubbed from the unsecure system. Dkt. 16 at 13 ¶ 92; Dkt. 20 at 13 (not disputed). Plaintiff has provided no evidence or argument that LNSSI's legitimate, non-retaliatory reason for reporting her email was pretextual, nor does the record provide any.

Accordingly, LNSSI is entitled to summary judgment on Plaintiff's retaliation claim based on the reporting of Plaintiff's email to the FSO.[30]

### 3. Termination

Additionally, Plaintiff alleges that LNSSI retaliated against her when it terminated her employment. The undisputed summary judgment record shows that Plaintiff was placed on the CAP on September 30, 2022. The CAP was scheduled from September 30, 2022, to October 31, 2022. Plaintiff sent emails to Reynolds in HR on October 11, 2022, and October 13, 2022, making reports of sex discrimination. Plaintiff's CAP was extended for an additional month past October 31, 2022, due to her sickness and Kearny's absence from the office for a portion of the time between September 30, 2022, and October 31, 2022. LNSSI terminated Plaintiff's employment, at the end of her extended CAP, effective December 1, 2022.

Again, assuming *arguendo* that Plaintiff is able to make out a *prima facie* case, LNSSI has provided a legitimate, non-retaliatory reason for Plaintiff's termination, namely her poor performance, and Plaintiff has provided no evidence that LNSSI's articulated reason is pretextual. LNSSI placed Plaintiff on the CAP before her complaint to Reynolds, and Plaintiff was unable to make sufficient progress under the CAP, leading to her termination. Essentially, "[t]he actions that led to [Plaintiff's] probation and termination began *before* her protected activity, [thus] belying the conclusion [of retaliation]." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (emphasis in original). Further, Plaintiff has not cited any record material

---

[30] Although the Court need not delve deeply into the issue here, the Court notes that to hold otherwise could chill supervisors from appropriately reporting potential security violations. *Cf. Kruise v. Fanning*, 214 F. Supp. 3d 520, 526-27 (E.D. Va. 2016). The Court further notes that, although the parties did not discuss it, this Court has previously held that the filing of a potential security violation report cannot constitute a retaliatory adverse action, because it is generally required by a contractor's mandatory reporting obligations. *See Patel v. Credence Mgmt. Solutions*, 2021 WL 5447526, at *4 (E.D. Va. Nov. 22, 2021).

showing that Defendant's "explanation is unworthy of credence or . . . offered other forms of circumstantial evidence sufficiently probative of retaliation." *Courtney v. N. Carolina Dep't of Transp.*, 2010 WL 4923344, *16 (M.D.N.C. Nov. 29, 2010) (internal brackets omitted). Nor has Plaintiff pointed to any evidence in the record, outside of the temporal closeness between her protected activity and her termination, to suggest that LNSSI's true reason for her termination was retaliation. Although temporal proximity may satisfy Plaintiff's burden at the *prima facie* stage, it is not sufficient to overcome the proffered legitimate, non-retaliatory reason for its action. *See Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017) ("Temporal proximity along is not enough to show that protected activity was a 'but for' cause of adverse employment action."); *New v. Family Health Care, P.C.*, 2019 WL 2744682, at *5 (D. Md. 2019) (concluding that "temporal proximity along d[id] not rebut Defendants' legitimate, and uncontested, ground of termination"). Accordingly, LNSSI is entitled to summary judgment on Plaintiff's retaliation claim based on Plaintiff's termination.

## V.  Conclusion

In sum, Plaintiff has failed to establish that any genuine issues of material fact exist to preclude summary judgment, and Plaintiff has failed to establish that a reasonable jury could find that Defendant's legitimate, non-discriminatory and non-retaliatory reasons for its actions to be pretextual. For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Summary Judgment (Dkt. 15) is GRANTED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment on behalf of Defendant and against Plaintiff; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
August 15, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge